UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

**UNITED STATES OF AMERICA,**

v.

ACTION NO. 4:12cr98

**MANZAIS ANTWAN GIVENS,**

Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the court on the Defendant's Motion to Suppress evidence obtained by law enforcement during a warrantless search of his vehicle on September 13, 2012 ("Motion"). For the reasons set forth herein, the Defendant's Motion is **DENIED**.

### I. Factual and Procedural History

On September 13, 2012, at 8:09 P.M., City of Hampton Police Detective Keith Tucker ("Det. Tucker") and Investigator Ryan Boone ("Inv. Boone") conducted a traffic stop of the Defendant's vehicle due to a broken license plate light. The key factual controversy before the court pertains to the United States' and the Defendant's divergent accounts of the duration of the stop. The following facts are not disputed by either party: Det. Tucker and the Defendant briefly discussed the reason for the stop, and the Defendant provided his operator's license while Det. Tucker attempted to engage him in conversation. The

Defendant provided curt answers, would not make eye contact with Det. Tucker, and exhibited physical manifestations of nervousness, including heavy breathing, sweating, shaking hands, and a pulsating carotid artery. Det. Tucker again requested the Defendant's registration, which the Defendant provided.

At a disputed point in time after initiation of the stop, Det. Tucker instructed Inv. Boone to have the K-9 Unit respond to their location. Det. Tucker again attempted to engage the Defendant in conversation, questioning him on where the Defendant was headed and why, which football team the Defendant hoped would win the National Football League game that evening, and what the Defendant had recently purchased at the store, as evidenced by plastic grocery bags in the back seat. In these bags were three boxes of sandwich bags visible to Det. Tucker and Inv. Boone.

Det. Tucker proceeded to check the state inspection sticker and front license plate, and asked the Defendant if he was wearing his seatbelt prior to the stop, to which the Defendant responded he had not been. Det. Tucker then returned to his vehicle to write citations for the broken license plate light and failure to wear a seatbelt. At this time, Det. Tucker requested a check of the Defendant's driver's license and a search for outstanding warrants. He then began filling out the

summons for the infractions. He completed the summons for the broken license plate light, and at some disputed time thereafter, Officer Boyd ("Off. Boyd") of the K-9 Unit arrived with his canine, Falko.

Off. Boyd spoke with Det. Tucker, informed the Defendant of the canine sniff procedure, and then proceeded to allow Falko to make a circuit around the vehicle. At the beginning of Falko's second pass around the vehicle, the canine alerted to drugs on the driver's door near the door seam and handle.[1] As Det. Tucker asked the Defendant to exit the vehicle, he noticed the Defendant's cell phone was illuminated. Det. Tucker placed the Defendant in handcuffs, at which time the Defendant received a call on his cell phone that Det. Tucker did not allow him to answer. Following the Defendant's detention, the officers searched the passenger compartment and then the trunk of the vehicle. In a duffel bag in the trunk, Det. Tucker found five (5) kilograms of cocaine in plastic wrapping.

The Defendant is charged with one count: Possession with Intent to Distribute Five (5) Kilograms or More of Cocaine, in

---

[1] Exhibit 9, Off. Boyd's K-9 Usage Report of the event, states the dog "gave a good head turn and then nose press to the seam area of the driver's door. Falko then alerted by biting at the drivers [sic] door handle." The driver's door handle is immediately adjacent to the door seam. See Ex. 11. At the hearing and in filings, the parties referred interchangeably to the dog's alert on the driver's door, the driver's door handle, and the door seam.

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). The Defendant filed the instant Motion and supporting Memorandum of Law on December 10, 2012, to which the United States responded on December 20, 2012. (ECF Nos. 16, 17 & 18.) The United States filed a supplemental response memorandum on January 22, 2012. (ECF No. 24.) Having thoroughly reviewed the Parties' pleadings and exhibits, and after conducting a hearing on January 23, 2013, this matter is now ripe for judicial determination.

## II. Findings of Fact

The overwhelming weight of credible witness testimony[2] and exhibits[3] admitted at the hearing support the finding that the

---

[2] The witnesses included Eric Brockwell, a computer specialist with the City of Hampton Police Department; Det. Keith Tucker, Inv. Ryan Boone, Off. Brian Boyd, and Off. Nicole Feldmann, all of the City of Hampton Police Department; and Leslie Caldwell of Atlantic Communications. Although Ms. Caldwell's testimony was confusing at times, it was nonetheless credible in the material respect for this Memorandum Opinion and Order. See infra note 7.

[3] The fourteen exhibits include: (1) City of Hampton Police Department Dispatch Log (9/12/2012); (2) the Narcotics Audio Transmission Recording (9/12/2012); (3) Atlantic Communications Service Ticket for Officer Boyd's in-vehicle camera system (12/6/2012); (4) a DVD of Off. Boyd's in-vehicle camera video footage; (5) a DVD of selected excerpts of Off. Boyd's in-vehicle camera video footage; (6) a DVD of Off. Feldmann's in-vehicle camera video footage; (7) a DVD of selected excerpts of Off. Feldmann's in-vehicle camera video footage; (8) the training records of the drug dog (2008-2012), Off. Boyd and the drug dog's ASCT certifications (2008-2012), the drug dog's usage logs (2008-2012); (9) the Defendant's cell phone call log (9/12/2012); (10) Defendant's summons; (11) one photograph of the Defendant, two of the exterior of his vehicle, and one of the back seat of the vehicle; (12) Off. Boyd's K-9 Usage Log

4

duration of the stop was approximately sixteen minutes prior to the drug dog's alert on the vehicle. Specifically, the evidence supports that Inv. Boone requested Off. Boyd to the scene approximately two minutes into the stop; Off. Boyd arrived approximately twelve minutes into the stop; and Falko alerted approximately four minutes later. At the hearing, the United States presented corroborating evidence in the form of the officers' testimony, the narcotics channel audio recording, video footage from the officers' in-vehicle video cameras, and the Defendant's cell phone call log. The evidence conclusively support the finding that the stop's duration was approximately sixteen minutes prior to the dog's alert.

Against the weight of these reliable, corroborative sources of evidence, the Defendant, relying exclusively on the City of Hampton Police Department dispatch log ("Dispatch Log"), and police reports prepared based on the times noted in the Dispatch Log, argues unconvincingly that the duration of the stop was approximately thirty-seven minutes before Officer Boyd arrived. In relevant part, the Dispatch Log reflects Det. Tucker and Inv. Boone's dispatch and arrival at 8:09 PM; Det. Boyd's dispatch at

---

Report (9/12/2012); (13) Off. Feldman's Incident Report (for 9/12/2012, created 9/18/2012); and (14) a Google map of the Aberdeen Road area in Hampton, Virginia. There were no objections to any of the exhibits, and both parties agreed to their authenticity.

5

8:21 PM and arrival at 8:46 PM; and Off. Feldmann's dispatch and arrival at 8:46 PM. The inaccuracy of these times is readily surmisable from the testimony of the officers and upon examination of the United States' exhibits,[4] to which admission and authenticity the Defendant agreed.[5]

### 1. Narcotics Channel Audio Recording

The narcotics channel audio recording, Exhibit 2, as confirmed by testimony at the hearing and after repeated review by the court, provides conclusive evidence that Off. Boyd was requested mere moments after Det. Tucker and Inv. Boone initiated the stop, not twelve minutes into the stop, as reflected in the Dispatch Log. Additionally, although the narcotics channel audio recording does not provide the time the events occurred, Off. Boyd is heard announcing his arrival at the location of the stop approximately twelve minutes after Inv.

---

[4] The court itself has repeatedly reviewed these agreed exhibits, particularly the audio and video transmissions that occurred simultaneously with the events of the traffic stop, together with the Defendant's cell phone records at the time of the stop. Exs. 2, 5, 7, 9; see infra notes 6 & 7 and accompanying text; infra Part II.3. At most, the duration of the stop prior to the dog's alert was sixteen minutes. See supra Part II at 4-6 (Findings of Fact).

[5] See supra note 3.

Boone is heard announcing the initiation of the stop.⁶ The duration of time after Off. Boyd's arrival and before the drug dog's alert is not captured in the narcotics channel transmissions but can be ascertained from Off. Boyd's in-vehicle video camera.

## 2. In-Vehicle Video Cameras

Off. Boyd's in-vehicle video camera, Exhibit 5, captured both his arrival at the location of the stop and the drug dog's alert on the vehicle. Although the time-stamp on Off. Boyd's video camera <u>is not reflective of the actual hour</u>,⁷ this footage <u>is nonetheless reliable as a timer</u>, showing the duration of these events to be approximately four minutes.

To further clarify that the times in the Dispatch Log are incorrect, and that Off. Boyd did not arrive at 8:46 PM, at the

---

⁶ The court confirmed Inv. Boone's request for the K-9 Unit 1 minute, 45 seconds after announcing the stop, and Off. Boyd's arrival 11 minutes, 54 seconds after the initiation of the stop.

⁷ Off. Boyd's in-vehicle video camera shows his arrival to be at 11:21; it does not indicate whether this time is in the morning or at night. Both parties acknowledge this time is incorrect. The United States' witness, Leslie Caldwell of Atlantic Communications, testified that although the in-vehicle video camera did not properly record the hour when the vehicle was turned off and on, it nonetheless functioned properly to keep time, once the video camera was in operation. The Defendant did not contest this fact, and the video appears to have recorded the events at real speed. Additionally, the court has independently reviewed Exhibit 5 and confirmed the duration of time reflected on the time stamps through use of a stop watch: The duration is between 3 minutes, 45 seconds and 3 minutes, 50 seconds.

same time as Officer Feldmann ("Off. Feldmann"), who transported the Defendant to Investigations, is the video footage from both Off. Boyd's and Off. Feldmann's in-vehicle video cameras. Exs. 5 & 7. The footage from both cameras, as supported by the Officers' testimony, shows that Off. Feldmann arrived at the location of the stop <u>after</u> the canine sniff had concluded and Falko had been returned to Off. Boyd's vehicle. Thus, Off. Boyd could not possibly have arrived at the same time as Off. Feldmann, and the time of Off. Boyd's arrival as recorded in the Dispatch Log is incorrect.

### 3. Defendant's Cell Phone Records

The Defendant's cell phone call log further supports that the stop, prior to the dog's alert, was approximately sixteen minutes in length. <u>See</u> Ex. 9. Det. Tucker testified that after the drug dog alerted and he approached the Defendant's vehicle, he observed that the Defendant's phone was illuminated, indicating it had recently been used. After placing the Defendant in handcuffs, the Defendant received a call that he said was from his father that Det. Tucker did not allow the Defendant to answer. The Defendant's call log shows the Defendant placed a call at 8:21 P.M. and received a call from the same number that went unanswered at 8:24 P.M. <u>See</u> Ex. 9. All subsequent calls to the Defendant in the next hour went

8

unanswered. Id. Although the times in the call log cannot be definitively synced to the Dispatch Log times, this time frame, wherein the drug dog alerts and the Defendant exits the vehicle and is placed in handcuffs between 8:21 and 8:24, roughly twelve to fifteen minutes into the stop, corroborates the narcotics audio channel transmissions and the footage from Officers Boyd and Feldmann's in-vehicle video cameras, all exhibits admitted without objection into evidence.[8]

### III. Discussion

The Defendant claims, in addition to his contention that the stop lasted approximately thirty-seven minutes, that the Government violated his Fourth Amendment rights in that (1) the police failed to pursue diligently the original purpose of the stop; (2) the police did not have reasonable suspicion of criminal activity to detain the Defendant in order to investigate drug trafficking; (3) the drug dog used for the vehicle investigation was not reliable, and thus could not provide probable cause for the search; and, (4) the dog's alert to the driver's door seam and handle did not provide probable cause for a search of the trunk of the vehicle where the contraband was found. The court will address each of these arguments in turn.

---

[8] See supra note 3.

## 1. Duration of the Stop

Having established that the duration of the stop prior to the dog's alert was approximately sixteen minutes, the court must analyze whether this duration ran afoul of the Fourth Amendment which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It did not. "When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). "Because an ordinary traffic stop is 'a limited seizure more like an investigative detention than a custodial arrest,'" it is evaluated against the standards articulated in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (quoting United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992)). There is not a dispute that the officers' actions were justified at inception (Terry's first prong); however, Terry's second prong, whether the stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure," is before the court. Florida v. Royer, 460 U.S. 491, 500 (1983).

There is no "mathematical precision" regarding the proper duration of a stop. United States v. Branch, 537 F.3d 328, 336

10

(4th Cir. 2008).[9] The Fourth Circuit recently provided the following guidance:

> Although the scope and duration components of Terry's second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket . . . . [T]he officer may inquire into matters unrelated to the justification for the traffic stop, and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle, . . . but again only so long as those inquiries or other actions do not measurably extend the duration of the stop.

United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012) (internal quotation marks and citations omitted).

Although the Defendant claims Det. Tucker engaged in a lengthy interrogation unrelated to the purpose of the stop, and delayed issuance of the citation until the drug dog arrived, the credible testimony of Det. Tucker supports that he was in the process of completing the first of the two citations--the first for the broken license plate light, and the second for failure to wear a seatbelt--when the K-9 Unit arrived and the dog

---

[9] Under various factual circumstances, the Fourth Circuit has approved stops ranging from eleven to thirty-five minutes against challenges of unreasonable delay. See, e.g., United States v. Mason, 628 F.3d 123, 132 (4th Cir. 2010) (11 minutes); United States v. Mincey, 321 F. App'x 233, 240-42 (4th Cir. 2008) (35 minutes); United States v. Jones, 289 F. App'x 593, 598-600 (4th Cir. 2008) (20 minutes); United States v. Ramirez, 29 F. App'x 111, 113-14 (4th Cir. 2002) (15 minutes); United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) (15 minutes).

11

alerted, at which time the clock stopped on the ordinary traffic stop. The Defendant put forth no evidence to support an allegation that the officers were not diligent in pursuing the original purpose of the stop. Even assuming the Defendant's best-case scenario of a thirty-seven minute stop, there is no evidence before the court to support that the officers "measurably extend[ed] the duration of the stop" to investigate drug trafficking. Id.

Moreover, it is clear that Det. Tucker's limited questioning on topics unrelated to the purpose of the stop should be considered a de minimis delay under Fourth Circuit precedent. See United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010) ("It has never been held that brief, incidental questioning about matters unrelated to the traffic violation violates the Constitution."); see also Digiovanni, 650 F.3d at 508 ("A police officer may proceed with diligence, even though he asks some questions unrelated to the stop, so long as the police officer's 'overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop.'" (quoting United States v. Everett, 601 F.3d 484, 495 (6th Cir. 2010)).

There is simply no evidence that the officers were overreaching or overzealous in their interactions with the

Defendant; accordingly, the duration and scope of the stop did not run afoul of the Fourth Amendment.

## 2. Reasonable Suspicion Analysis

Despite the fact that the officers were diligent in pursuing the original purpose of the stop, the court in addition finds that the stop permissibly may have been prolonged because the officers had reasonable suspicion that the Defendant was engaged in unlawful activity. "A prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." Branch, 537 F.3d at 336. Once there is reasonable suspicion, an officer may "briefly extend the stop for a period of time reasonably necessary to confirm or dispel his suspicions." Vaughan, 700 F.3d at 710.

To demonstrate reasonable suspicion, an officer "must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." Branch, 537 F.3d at 337 (quoting, respectively, Illinois v. Wardlow, 528 U.S. 119, 123 (2000), Terry, 392 U.S. at 21). "[F]actors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together," and "due weight [must be given] to common sense judgments reached by officers in light of their experience and training." United States v. Perkins, 363 F.3d 317, 321 (4th Cir.

2004), cert. denied, 543 U.S. 1056 (2005). Additionally, "a court's review of the facts and inferences produced by a police officer to support a Terry stop must be holistic," and consider the totality of the circumstances based on "'an objective assessment of the officer's actions.'" Branch, 537 F.3d at 337 (quoting Scott v. United States, 436 U.S. 128, 137 (1978)); Perkins, 363 F.3d at 322.

Here, the court finds that the officers adequately established that they had reasonable suspicion based on seven facts: (1) the Defendant failed to make eye contact with Det. Tucker; (2) he did not respond to the majority of Det. Tucker's questions; (3) his hands were shaking and he was sweating; (4) he was breathing heavily, and his carotid artery was pulsating; (5) it was night-time in a high-crime area; (6) the stop occurred along a corridor known for transporting drugs, and the officers had specific information from a confidential informant that the area was particularly active; and (7) there were multiple boxes of ziplock bags in the backseat of the car, and ziplock bags are commonly used by drug traffickers to package their product.

These circumstances must be viewed holistically. Branch, 537 F.3d at 337. The first four relate primarily to the Defendant's nervous and evasive behavior, which the Supreme

14

Court has recognized as "a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124; see also United States v. Mubdi, 691 F.3d 334, 344 (4th Cir. 2012); Vaughan, 700 F.3d at 711 (finding that the Defendant's shaking hands, labored breathing, and verbal manifestations of nervousness are "valid factor[s] contributing to reasonable suspicion").

Although facts five and six would apply to any individual the officers detained at that time and in that area, such facts may contribute to reasonable suspicion in a "totality of the circumstances" analysis. See United States v. Johnson, 599 F.3d 339, 345 (4th Cir. 2010) ("The Supreme Court has held that the combination of presence in an area known for heavy narcotics trafficking and unprovoked flight upon seeing police arrive was enough to support a reasonable suspicion under Terry."). Additionally, the officers' awareness that ziplock bags are commonly used to package drug traffickers' products, contributed to their suspicion of illegal activity, leading them to call the K-9 Unit mere moments into the stop.

Accordingly, "even though some of these facts, viewed in isolation, might be consistent with innocent travel," the totality of the circumstances facing the officers supports that they had reasonable suspicion that criminal activity was afoot. Mubdi, 691 F.3d at 344. Thus, the officers permissibly may have

15

detained the Defendant for a short period of time in order to confirm or dispel their suspicions.[10]

### 3. Probable Cause to Search the Defendant's Vehicle

Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One established exception to the Fourth Amendment's warrant requirement is the "automobile exception." If police have probable cause to believe that contraband or evidence is contained in an automobile, they may search the automobile without first obtaining a warrant. California v. Acevedo, 500 U.S. 565, 580 (1991). Probable cause to search is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether probable cause exists to justify the search depends on the totality of the circumstances. Id. at 241; United States v. Humphries, 372 F.3d 653, 657-58 (4th Cir. 2004) ("[T]he question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a 'reasonable ground for belief of guilt' that was 'particularized with respect to the person to be

---

[10] However, as discussed supra Part II, the facts do not support that the officers delayed issuance of the Defendant's citations until the K-9 Unit's arrival.

16

searched or seized.'" (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)). Probable cause is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Pringle, 540 U.S. at 370 (citing Gates, 462 U.S. at 231). As such, probable cause does "not require officials to possess an airtight case before taking action." Taylor v. Farmer, 13 F.3d 117, 121 (4th Cir. 1993).

The Supreme Court and the Fourth Circuit have consistently held that a drug dog's positive alert on a vehicle provides probable cause to search the vehicle. Florida v. Royer, 460 U.S. 491, 506 (1983); Branch, 537 F.3d at 340 n.2; United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994); United States v. Robinson, 707 F.2d 811, 815 (4th Cir. 1983). After evaluating the totality of the evidence before it, including the circumstances that gave rise to the officers' reasonable suspicion, the court finds that the drug dog's alert in the vicinity of the driver's door seam and handle provided probable cause to search the trunk of the Defendant's vehicle.[11]

## A. Reliability of the Drug Dog

At the hearing, the United States provided overwhelming evidence regarding the reliability of the drug dog, Falko. Not

---

[11] See infra Part III.3.B.

only did the K-9 Officer, Off. Boyd, testify as to the dog's performance in the field, but the court also received and reviewed the extensive records of the dog's training and certification. To briefly summarize, Off. Boyd, the handler, and Falko have been certified as a team by the American Society of Canine Trainers ("ASCT") since 2008, and Falko has been in-service as a drug dog since 2006. Over the numerous years that Falko has worked with the same handler, he has received, with few exceptions, approximately sixteen (16) hours of training a month, at which Off. Boyd was also present. Further, as the Defendant's counsel conceded, Falko's usage logs exhibit a greater than 50% accuracy in detection of contraband, including cocaine, marijuana, heroin, and methamphetamines. In short, it is difficult to contemplate a more complete and compelling record that could be before the court regarding this drug dog's abilities.[12] Thus, the dog's alert on the vehicle, especially

---

[12] The court is familiar with Harris v. State, currently under the Supreme Court's consideration. 71 So. 3d 756, 768 (Fla. 2011), cert. granted, 132 S.Ct. 1796 (U.S. Mar. 26, 2012) (No. 11-817). In Harris, the Florida Supreme Court "adopt[ed] a totality of the circumstances approach" and held "that the State, which bears the burden of establishing probable cause, must present all records and evidence that are necessary to allow the trial court to evaluate the reliability of the dog." 70 So. 3d at 721. Although Harris is, of course, not binding, the court has reviewed all of the records the Florida Supreme Court would require (records of successes and false alerts, the handler's experience and qualifications, evidence regarding residual odors, etc.) and finds that the United States has

when viewed in light of the Defendant's behavior and the totality of the circumstances facing the officers, provided probable cause for the search.

## B. Probable Cause to Search the Trunk

The fact that the drug dog alerted in the vicinity of the driver's door seam and handle, rather than at the trunk, does not, as the Defendant contends, compel the conclusion that a search of the trunk was unsupported by probable cause. Recently, in United States v. Kelly, the Fourth Circuit upheld a search of a trunk after a dog's alert to the driver's door handle, holding that "[p]robable cause is simply not so exacting a standard that it requires a dog to be able to pinpoint the location of drugs within a foot or two." 592 F.3d 586, 592 (4th Cir. 2010). Indeed, the court in Kelly noted that the defendant "cites no authority supporting [the] bold proposition . . . that a dog's alert at one compartment cannot give probable cause to search another compartment simply because the latter is a few feet away." Id.[13] The facts presently before the court compel the same conclusion as in Kelly. The dog's alert, viewed holistically

---

credibly and more than adequately established the drug dog's reliability. Holding this Memorandum Opinion and Order in abeyance pending Harris' resolution is, thus, unnecessary.

[13] See also United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002) (affirming that "the dog's alerting [at a driver's door] was sufficiently close to the trunk to give [the officer] probable cause to believe it contained contraband.").

19

with the other indicia--the Defendant's nervous and evasive behavior, the paraphernalia for packaging drugs, the location of the stop--all support a finding that the officers had probable cause to search the trunk of the Defendant's vehicle where the contraband was found.

### IV. Conclusion

The evidence before the court conclusively shows that the officers did not impermissibly extend the duration of the stop, and that they had reasonable suspicion, supported by articulable facts, that would have justified any minor delay in the Defendant's detention. Additionally, the totality of the circumstances support that the officers had probable cause to conduct a search of the trunk of the vehicle. Thus, the stop and the subsequent search and seizure of evidence did not violate the Fourth Amendment, and the Defendant's Motion to Suppress is **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion and Order to counsel for all parties. Counsel are **DIRECTED** to contact the Calendar Clerk within ten (10) days of the date of the Memorandum Opinion and Order to set a date for the jury trial.

**IT IS SO ORDERED.**

Newport News, Virginia
February 12, 2013

/s/
**Rebecca Beach Smith
Chief
United States District Judge**